O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAMARY T.,

               Plaintiff,

   v.

ANDREW M. SAUL, Commissioner of Social Security,

               Defendant.

Case No. 5:20-CV-00833 KES

MEMORANDUM OPINION AND ORDER

**I.**

**BACKGROUND**

Plaintiff Damary T. ("Plaintiff") was born in December 1970 and diagnosed with multiple sclerosis ("MS") in the early 1990s.  Administrative Record ("AR") 295, 1314, 1730.  She worked for 25 years at Hutchings Court Reporters until January 2014.  AR 334, 1740.  In December 2013 (just before her alleged disability onset date of January 21, 2014) she reported hip pain from sitting eight hours per day at work.  AR 1608.  A physical examination revealed 5/5 motor strength and a normal range of joint motion.  AR 1608.  A hip MRI was normal.  AR 1614.

After leaving Hutchings, Plaintiff pursued a workers' compensation claim for "work stress," and she also sued Hutchings for discrimination.  AR 1722, 1731,

1740.  She claimed that work stress had exacerbated her MS symptoms.  AR 1721.
In May 2014, psychiatrist E. Richard Dorsey, M.D., completed a primary treating
physician's initial comprehensive psychiatric report in connection with her
workers' compensation claim.  AR 1741.  Plaintiff told Dr. Dorsey that she was
"asymptomatic neurologically and is not taking any medications for [MS]."  AR
1740.  Dr. Dorsey prescribed anti-depressants, anti-anxiety medication, and group
therapy.  AR 1719.

When Plaintiff's litigation settled in 2015, she received a substantial amount
of money, but she put about $50,000 cash in a bag in her room and then lost it; she
suspected it was stolen but never filed a police report.  AR 92–97, 249.  She
subsequently earned income by renting out her house.  AR 93–95, 1040.

In August 2015, Plaintiff underwent an annual physical by her then-primary
care physician, Sarina Kular, M.D.  AR 575–78.  Dr. Kular observed normal motor
strength, full range of motion, and other "normal" findings.  AR 577.  Nevertheless,
Plaintiff told Dr. Kular that she wanted to apply for disability benefits, because "her
workers comp case is over and she does not feel ready to [return to work] and is
living on the last of the money she has."  AR 575.  Plaintiff had obtained a walker
but had not started to use it.  AR 584.

In September 2015, Plaintiff applied for Title II Disability Insurance Benefits
alleging that she became unable to work on January 21, 2014, due to MS, extreme
fatigue, panic attacks, anxiety, depression, lumbago, bursitis, diabetes, plantar
fascia, heel spurs, cognitive issues, and other impairments.  AR 116.  On August 7
and December 6, 2018, an Administrative Law Judge ("ALJ") conducted hearings
at which Plaintiff, who was represented by counsel, appeared and testified.[1]  AR

---

[1] The ALJ held a supplemental hearing after additional workers'
compensation records were submitted and a neurological consultative examination
was performed in September 2018.  AR 50, 103, 106, 112, 1303.

1   48–66, 68–115.  A vocational expert ("VE") also testified.  AR 57–64, 103–10.  On
2   February 1, 2019, the ALJ issued an unfavorable decision.  AR 15–28.

3       The ALJ found that Plaintiff's "disorders of the back; multiple sclerosis;
4   obesity; affective disorder; and anxiety disorder" were severe, medically
5   determinable impairments ("MDIs").[2]  AR 17.  Despite these impairments, the ALJ
6   found that Plaintiff had the residual functional capacity ("RFC") to perform a range
7   of light work, except "occasionally climb ramps and stairs; and occasionally
8   balance, stoop, kneel, crouch, and crawl.  [Plaintiff] is precluded from climbing
9   ladders, ropes, or scaffolds.  Additionally, [Plaintiff] is limited to performing
10   simple, routine tasks; and making simple work-related decisions."  AR 19.

11       Based on this RFC and the VE's testimony, the ALJ found that Plaintiff
12   could not do her past relevant work as a court reporter, but she could do the simple,
13   sedentary jobs of addressing clerk, ampoule sealer, and bench hand.  AR 26–27
14   (citing Dictionary of Occupational Titles ["DOT"] codes 209.587-010, 559.687-
15   014, and 700.687-062).  The ALJ concluded that Plaintiff was not disabled.  AR 28.

**II.**

**ISSUES PRESENTED**

18       <u>Issue One-A</u>: Whether the ALJ erred at step two of the sequential evaluation
19   process by failing to find that (1) Plaintiff was diagnosed with fibromyalgia as an
20   MDI, and (2) her fibromyalgia was "severe."  (Dkt. 18, Joint Stipulation ["JS"] at
21   3–4.)

22       <u>Issue One-B</u>: Whether the ALJ's RFC determination is supported by
23   substantial evidence because it fails to account for any functional limitations caused
24   uniquely by fibromyalgia.  (JS at 8.)

---

26       [2] The ALJ also found that Plaintiff's MDIs of Bell's palsy, plantar fasciitis,
27   obstructive sleep apnea, left ankle issues, knees issues, vision issues, and carpal
tunnel syndrome caused only a slight abnormality that would have no more than a
28   minimal effect on her ability to work and were therefore nonsevere.  AR 18.

1      Issue Two: Whether the ALJ's RFC determination is supported by substantial

2 evidence even upon considering the new evidence Plaintiff submitted to the

3 Appeals Council.  (JS at 3, 11–12.)

4 **III.**

5 **DISCUSSION**

6 **A.**    **Issue One-A: Step Two Error.**

7      At step two, the ALJ must determine the claimant's MDIs and assess whether

8 each is severe. 20 C.F.R. § 404.1520(a)(4)(ii); see Social Security Rule ("SSR") 16-

9 3p, 2017 WL 5180304, at *11, 2014 SSR LEXIS 4, at *28–29 ("At step 2 of the

10 sequential evaluation process, we determine whether an individual has a severe

11 medically determinable physical or mental impairment or combination of

12 impairments that has lasted or can be expected to last for a continuous period of at

13 least 12 months or end in death.").  However, because "[s]tep two is merely a

14 threshold determination[,] … [i]t is not meant to identify the impairments that

15 should be taken into account when determining the RFC."  Buck v. Berryhill, 869

16 F.3d 1040, 1048–49 (9th Cir. 2017).  Thus, errors at step two are generally

17 harmless if the ALJ proceeds to step three, because in determining the claimant's

18 RFC, the ALJ must consider the functional limitations caused by all of the

19 claimant's impairments, whether severe or not.  Id. at 1049 ("in assessing RFC, the

20 adjudicator must consider limitations and restrictions imposed by all of an

21 individual's impairments, even those that are not 'severe'") (citation omitted); see

22 Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1056 (9th Cir. 2006) ("any

23 error ALJ committed at step two was harmless because the step was resolved in

24 claimant's favor"); see, e.g., Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007)

25 ("Even assuming that the ALJ erred in neglecting to list the bursitis at Step 2, any

26 error was harmless.").

27      The Agency provides regulatory guidance determining when a claimant's

28 pain can be attributed to fibromyalgia as an MDI.  A mere fibromyalgia diagnosis is

4

not sufficient.  SSR 12-2p,  2012 WL 3104869, at *2, 2012 SSR LEXIS 1, at *3 ("We cannot rely upon the physician's diagnosis alone.").  Instead, claimants seeking to establish a fibromyalgia diagnosis must present medical evidence that includes (1) a diagnosis from an acceptable medical source who "reviewed the person's medical history and conducted a physical exam"; (2) a "history of widespread pain"; (3) "At least 11 positive tender points on physical examination ([using the tender points identified in a] diagram …).  The positive tender points must be found bilaterally (on the left and right sides of the body) and both above and below the waist";[3] and (4) "Evidence that other disorders that could cause the symptoms or signs were excluded."  SSR 12-2p,  2012 WL 3104869, at *2–3, 2012 SSR LEXIS 1, at *3–9.

Plaintiff argues that the ALJ should have identified fibromyalgia as one of Plaintiff's MDIs.  (JS at 4.)  As records sufficient to establish that Plaintiff was diagnosed with fibromyalgia, she points to records from rheumatologist Kavoos C. Nazeri, M.D., dating from December 2017 through April 2018 and one record from the University of California at Riverside ("UCR") MS program dated March 15, 2018.  (JS at 5–6.)

Dr. Nazeri's treating records are summarized as follows:

• December 2017: Dr. Nazeri noted that Plaintiff was referred to him "for joint pain."  AR 1052.  Under HPI [History of Present Illness] Notes, he documented that Plaintiff reported having fibromyalgia, MS, and other impairments.  AR 1052.  He did not list fibromyalgia under Plaintiff's "Past Medical History."  AR 1052.  He conducted a physical examination and noted "soft

---

[3] Alternatively, instead of positive tender points, an MDI of fibromyalgia can be established by "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  SSR 12-2p, 2012 WL 3104869, at *3, 2012 SSR LEXIS 1, at *8–9.

tissue tenderness 14/18." AR 1053. Plaintiff interprets this as a reference to the 18 tender points used to diagnose fibromyalgia. (JS at 5 [citing SSR 12-2p].) Dr. Nazeri listed fibromyalgia as an "active" problem and his "primary" assessment. AR 1054. He noted, "Patient *seems* to have components of Fibromyalgia." AR 1054 (emphasis added). He prescribed Lyrica. AR 455, 1054.

   • January and March 2018: Dr. Nazeri made similar notations about fibromyalgia and directed Plaintiff to continue taking Lyrica. AR 1056–58, 1060–62.

   • April 2018: Plaintiff had tenderness at 11 of 18 points. AR 1065. Dr. Nazeri again wrote that Plaintiff "seems to have components of Fibromyalgia," and he increased her Lyrica dosage. AR 1064–66.

   In the UCR record, Elizabeth H. Morrison-Banks, M.D., noted that she saw Plaintiff on March 15, 2018, for an "initial neuroimmunology consultation." AR 1229. At that time, UCR did not have Plaintiff's "prior medical records or imaging," but Plaintiff reported herself as suffering from fibromyalgia. AR 1229.

   Plaintiff's arguments fail to establish that the ALJ erred at step two. The cited records do not establish that Plaintiff ever received a diagnosis of fibromyalgia that satisfies SSR 12-2p.[4] The UCR record does not satisfy SSR 12-2p criterion (1), because Dr. Morrison-Banks examined neither Plaintiff nor her medical history prior to noting that Plaintiff reporting having fibromyalgia. Dr. Nazeri's records do not satisfy SSR 12-2p criterion (3), because Dr. Nazeri never ruled out other disorders that could cause Plaintiff's symptoms or signs, including

---

[4] Plaintiff did not initially claim disability due to fibromyalgia. AR 299 (9/30/15 application pre-dating treatment with Dr. Nazeri), 354–55 (11/18/15 list of impairments), 536–37 (11/10/15 questionnaire identifying "no" fibromyalgia), 379–81 (2/10/16 updated disability report not listing fibromyalgia). In June 2018, she reported that she had been diagnosed with "moderate fibromyalgia." AR 450. Neither she nor her lawyer mentioned fibromyalgia at the hearings.

Plaintiff's MS.[5]   Instead, Dr. Nazeri noted that Plaintiff had been diagnosed with MS for many years and "*seems* to have components of Fibromyalgia."  AR 1052, 1054.  SSR 12-2p expressly contemplates that rheumatological disorders like MS may cause symptoms similar to fibromyalgia.  2012 WL 3104869, at *3 & n.7, 2012 SSR LEXIS 1, at *6 & n.7.  When there is insufficient evidence to find that a claimant suffers from fibromyalgia as an MDI, but the claimant was diagnosed with a rheumatological disorder like MS, SSR 12-2p instructs ALJs to consider all the functional limitations caused by the claimant's MS.  2012 WL 3104869, at *2, 2012 SSR LEXIS 1, at *4 ("If we cannot find that the person has an MDI of FM but there is evidence of another MDI, we will not evaluate the impairment under this Ruling.  Instead, we will evaluate it under the rules that apply for that impairment.").  That is what the ALJ did in this case.

**B.     Issue One-B: Fibromyalgia's Effect on Plaintiff's RFC.**

Plaintiff argues that the ALJ "ignored" her fibromyalgia when determining her RFC.  (JS at 7–8.)  When determining a claimant's RFC, ALJs have no duty to include limitations caused by conditions that are not MDIs.  SSR 96-8p, 1996 WL 374184, at *2, 1996 SSR LEXIS 5, at *7 ("[I]n assessing RFC, the [ALJ] must consider only limitations and restrictions attributable to medically determinable impairments.").  As discussed above, the ALJ did not err by failing to identify fibromyalgia as one of Plaintiff's MDIs.

But even if Plaintiff did suffer from fibromyalgia as an MDI, Plaintiff fails to identify any evidence that her fibromyalgia caused unique functional limitations for which the ALJ did not account by considering other physical and mental impairments.  The ALJ accounted for Plaintiff's mental impairments by limiting her

---

[5] While "[m]ultiple sclerosis (MS) and fibromyalgia are very different conditions …, they sometimes share similar symptoms and signs." <https://www.healthline.com/health/multiple-sclerosis/multiple-sclerosis-vs-fibromyalgia> (last visited Feb. 26, 2021).

1   to "simple, routine tasks" and only "simple" decision-making.  AR 19.  This kind of

2   work requires only level 1 or 2 reasoning, the lowest two levels on the DOT's 6-

3   level scale.  See Zavalin v. Colvin, 778 F.3d 842, 847 (9th Cir. 2015).  Even if

4   Plaintiff suffers from "fibro fog," as she alleges (JS at 5), she has failed to identify

5   any evidence that she is too mentally impaired to do even simple work.  In June

6   2016, Anthony Benigno, Psy.D., performed a consultative psychological

7   examination and opined that Plaintiff would have no difficulty understanding,

8   remembering, and performing simple tasks or making simplistic work-related

9   decisions without special supervision.  AR 711.  During her period of claimed

10  disability Plaintiff could use a phone and computer, contract with tenants to rent her

11  house, go shopping, care for pets, prepare simple meals, use a checkbook, ride

12  public transportation, play memory games, pursue legal claims, keep track of her

13  medical appointments, write letters and survey responses about her treatment, and

14  respond appropriately when interacting with medical sources.[6]  AR 93–94, 353,

15  358–61, 707, 860–70, 1957.

16      Although the RFC limits Plaintiff to a reduced range of light work (AR 19),

17  the alternative jobs identified by the ALJ involve more restrictive sedentary work

18  (AR 27).  While Plaintiff testified that she suffered from too much pain and fatigue

19  to work, the ALJ gave clear and convincing reasons for discounting her testimony

20  (AR 20–21), which Plaintiff does not challenge on appeal.  In September 2018,

21  Sarah L. Maze, M.D., performed a consultative neurological examination and

22

23      [6] While Plaintiff reported she was "unable to drive" in November 2011

24  because "previous neurologist … reported me to the DMV for unconscious level
    due to sedative" (AR 369), in October 2015, she was "requesting clearance for

25  DMV to get license" (AR 512).  In November 2015, she "picked up DMV
    clearance to drive from psychiatric standpoint."  AR 616.  In March 2018, she

26  reported that her driver's license was suspended "because of a miscommunication

27  about neurological symptoms in which she did not intend to suggest that she had
    had a loss of consciousness."  AR 1229.

28

8

opined that Plaintiff could do light work.  AR 1305.  Plaintiff fails to identify any medical evidence to demonstrate that the ALJ, after properly discounting Plaintiff's subjective symptom testimony and assessing a more restrictive RFC than the CE, should have included even more restrictions in her RFC due to fibromyalgia.  See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 n.2 (9th Cir. 2009) (because the claimant "[did] not detail what other physical limitations follow from the evidence of his knee and should injuries, besides the limitations already listed in the RFC," the court "reject[ed] any invitation to find that the ALJ failed to account for [the claimant's] injuries in some unspecified way"); see also Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985) ("The mere diagnosis of an impairment … is not sufficient to sustain a finding of disability."); accord Lundell v. Colvin, 553 F. App'x 681, 684 (9th Cir. 2014).

**C.   Issue Two: New Evidence.**

    **1.   Relevant Administrative Rules and Proceedings.**

On April 1, 2019, Plaintiff sought Appeals Council ("AC") review on the grounds that the ALJ "made numerous errors of law and fact which are not supported by substantial evidence."  AR 246.  On May 14, 2019, Plaintiff presented a brief, arguing that there was "good cause" for the AC to consider three pieces of new evidence that her prior counsel had failed to submit "for an unknown reason."  AR 464.  The AC determined that the new evidence "does not show a reasonable probability that it would change the outcome of the decision" and denied Plaintiff's request for review.  AR 1–2.

The AC will review "additional evidence" it receives if the evidence is "new, material, *and* relates to the period on or before the date of the hearing decision, *and* there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 404.970(a)(5) (emphasis added).  However, the AC will "consider" additional evidence *only* if the claimant "show[s] good cause for not [timely] informing [the Agency] about or submitting the evidence."

1  Id. § 404.970(b).  If the AC determines that the additional evidence "does not relate

2  to the period on or before the date of the administrative law judge hearing

3  decision …, or the Appeals Council does not find [the claimant] had good cause for

4  missing the deadline to submit the evidence …, the Appeals Council will send [the

5  claimant] a notice that explains why it did not *accept* the additional evidence and

6  advises [the claimant] of [her] right to file a new application."  Id. § 404.970(c)

7  (emphasis added).

8      Here, Plaintiff argued that she had "good cause" for her late submissions.

9  AR 464.  The AC did not advise Plaintiff of her right to file a new application.  AR

10  1–3.  Thus, the AC apparently found that Plaintiff had good cause for her late

11  submissions and that the additional evidence was temporally relevant.  Cf. 20

12  C.F.R. § 404.970(c).  However, while the AC "accepted" and "considered" the

13  additional evidence, it nevertheless found that the evidence "does not show a

14  reasonable probability that it would change the outcome of the [ALJ's] decision."

15  AR 2; see HALLEX I-3-5-20(C)(4), 1993 WL 643143, at *2 (If the AC denies a

16  request for review, it will "[i]nclude language in the denial notice specifically

17  identifying the additional evidence (by source, date range, and number of pages)

18  and the reason why the evidence does not provide a basis for granting review.").[7]

19      When additional evidence does not meet *all* the criteria of § 404.970(a)(5)–

20  (b)—i.e., good cause for late submission; new, material, and temporally relevant;

21  *and* reasonable probability that it would change ALJ's decision—the AC will *not*

22  "exhibit" the evidence.  20 C.F.R. § 404.976(b) (eff. Dec. 16, 2020) ("The Appeals

23  Council will evaluate all additional evidence it receives, but will only mark as an

24  exhibit and make part of the official record additional evidence that it determines

25

26  ──────────────

27      [7] The Agency's Hearings, Appeals, and Litigation Law Manual
    ("HALLEX") "conveys guiding principles, procedural guidance, and information to

28  hearing level and Appeals Council staff."  HALLEX I-1-0-1, 2005 WL 1863821.

meets the requirements of § 404.970(a)(5) and (b).").[8]  Nevertheless, while the additional evidence is not "exhibited," it has long been the Agency's standard practice that the additional evidence is *included* in the official transcript of the administrative record prepared for federal court review.  See 84 FR 70080-01, 2019 WL 6912927, at *70083; HALLEX I-4-2-20, 2017 WL 1032553 (eff. May 1, 2017) (additional evidence not exhibited will nonetheless be included in the administrative record); HALLEX I-3-5-20(c)(3), 1993 WL 643143 (eff. May 1, 2017) (even when the AC declines to "consider" new evidence, "a copy of the evidence is placed in the appropriate section of the file" and is "included in the certified administrative record if the case is appealed to the Federal court"); see also 42 U.S.C. § 405(g) ("the Commissioner … shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based").  This requirement is now memorialized in the regulations.  20 C.F.R. § 404.976(b) (eff. Dec. 16, 2020) ("If we need to file a certified administrative record in Federal court, we will include in that record all additional evidence the Appeals Council received during the administrative review process, including additional evidence that the Appeals Council received but did not exhibit or make part of the official record.").

Here, while the additional evidence was not "exhibited," it was included in the certified administrative record (AR 36–46) and was described by the Agency in its Court Transcript Index as "medical evidence of record."  (Dkt. 17-2 at 1.)  If additional evidence is included in the administrative record, a federal court will generally consider the additional evidence when reviewing whether the ALJ's

---

[8] While § 404.976(b) was revised effective December 16, 2020, it represents the Agency's standard practices dating from at least May 2017.  84 FR 70080-01, 2019 WL 6912927, at *70083 (Dec. 20, 2019); see HALLEX I-4-2-20, 2017 WL 1032553 (eff. May 1, 2017) (additional evidence that does not meet requirements of § 404.970(b) will not be exhibited).

decision was supported by substantial evidence.  Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1163 (9th Cir. 2012) ("When the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."); cf. Bales v. Berryhill, 688 F. App'x 495, 496 (9th Cir. 2017) (because the AC did not *consider* new medical records which "did not 'relate to the period on or before the date of the administrative law judge hearing decision' and … advise[d] [the claimant] of her right to file a new application," the new medical records did not become part of the certified administrative record before the district court).[9]

Plaintiff argues that the "Appeals Council's refusal to consider this evidence, or remand the case back to the ALJ to consider this evidence, is error requiring remand."  (JS at 13.)  Alternatively, Plaintiff argues that the AC did consider the evidence, but only in a "wholly conclusory fashion," which caused it to conclude erroneously that the evidence did not have a reasonable probability of changing the outcome determined by the ALJ.  (JS at 13, 17.)  In both arguments, Plaintiff asks the district court to remand because of error by the AC.  (See, e.g., JS at 13 ["the Appeals Council erred …"].)

The AC's finding that the additional evidence did not show a reasonable probability that it would change the outcome of the ALJ's decision is a discretionary decision that this Court has no jurisdiction to review.  In Califano v. Sanders, 430 U.S. 99, 107–09 (1977), the Supreme Court held that the AC's refusal

---

[9] Bales was an unusual situation where the AC took the case under review and issued its own decision, adopting the ALJ's findings at steps one, two, and three, but reversing the ALJ's finding at step four that the claimant could perform her past relevant work.  Bales v. Comm'r of Soc. Sec., No. 14-CV-01553, 2015 WL 5686884, at *2 (D. Or. Sept. 25, 2015), aff'd sub nom. Bales v. Berryhill, 688 F. App'x 495 (9th Cir. 2017).

to reopen a claim years after the initial denial was discretionary and not subject to judicial review.  The Ninth Circuit later cited <u>Sanders</u> in deciding that it had no jurisdiction to review an AC denial of a request to extend the filing period.  <u>See</u> <u>Peterson v. Califano</u>, 631 F.2d 628, 630 (9th Cir. 1980) (holding that AC's denial of request to extend filing period, after attorney claimed that letter from AC regarding the deadline had never been received or was misfiled, was not reviewable, because a "final decision ... plainly refers to a decision on the merits").  Indeed, whatever the reason for the AC's determination to deny review of the ALJ's decision is simply nonreviewable.  <u>See</u> <u>Luther v. Berryhill</u>, 891 F.3d 872, 876 (9th Cir. 2018) ("the Appeals Council's reasoning for denying review is not considered on subsequent judicial review"); <u>Brewes</u>, 682 F.3d at 1161 (Federal courts "do not have jurisdiction to review a decision of the Appeals Council denying a request for review of an ALJ's decision, because the Appeals Council decision is a non-final agency action."); <u>V.A. v. Saul</u>, 830 F. App'x 202, 205 (9th Cir. 2020) ("We have no jurisdiction to review the Appeals Council's decision not to remand the case after V.A. submitted an opinion from Dr. Mandiberg and medical evidence supporting a diagnosis of carpal tunnel syndrome."); <u>see also</u> <u>Spears v. Berryhill</u>, 720 F. App'x 358, 361 (9th Cir. 2017) ("the Court lacks jurisdiction to review the Appeals Council's decision about the contents of the record because such a decision is not a final agency action").  Instead, when the AC denies review, "the ALJ's decision becomes the final decision of the Commissioner," subject to substantial evidence review based on the whole record.  <u>Taylor v. Comm'r of Soc. Sec. Admin.</u>, 659 F.3d 1228, 1231 (9th Cir. 2011); <u>accord</u> <u>Luther</u>, 891 F.3d at 876 ("a reviewing court may review additional evidence submitted to and rejected by the Appeals Council, but may not review an Appeals Council decision denying a request for review").

While this Court has no jurisdiction to review the AC's decision, the Court will treat the additional evidence as part of the administrative record, all of which

1   must be considered when reviewing the Commissioner's final decision for

2   substantial evidence.  Brewes, 682 F.3d at 1163.  Thus, the Court will determine

3   whether the ALJ's decision remains legally valid, even when considering the

4   additional evidence.  See generally Carmickle v. Comm'r, Soc. Sec. Admin., 533

5   F.3d 1155, 1162 (9th Cir. 2008) ("the relevant inquiry in this context is not whether

6   the ALJ would have made a different decision absent any error, it is whether the

7   ALJ's decision remains legally valid, despite such error") (citation omitted).

8        Plaintiff contends that the appropriate standard of review is whether the

9   additional evidence "created a reasonable probability that it would change the

10  outcome of the ALJ's decision."  (JS at 23–24) (citing Mayes v. Massanari, 276

11  F.3d 453, 462 (9th Cir. 2001)).  But the issue in Mayes was whether the district

12  court should have remanded the case under sentence six of § 405(g) for materiality

13  and good cause.  276 F.3d at 462–63.  Here, the additional evidence is included in

14  the administrative record and must be considered when reviewing the ALJ's

15  decision for substantial evidence under section four of § 405(g).  Carmickle, 533

16  F.3d at 1162.

17       **2.     Consideration of Additional Evidence.**

18       Plaintiff submitted three new pieces of evidence to the AC (AR 2) : (1) an

19  RFC Questionnaire by Ronald Bailey, M.D., dated December 5, 2017 (AR 36–40);

20  (2) a letter dated February 14, 2019, from Nurse Practitioner ("NP") Lynsey Lakin

21  of the UCR MS Program (AR 41); and (3) an RFC Questionnaire by Dr. Morrison-

22  Banks dated December 4, 2018 (AR 42–45).  The medical opinion of a claimant's

23  treating physician is given "controlling weight" so long as it "is well-supported by

24  medically acceptable clinical and laboratory diagnostic techniques and is not

25  inconsistent with the other substantial evidence in [the claimant's] case record."[10]

26

27       [10] In contrast to Plaintiff's September 2015 claim, for claims filed on or after
    March 27, 2017, the Agency "will not defer or give any specific evidentiary weight,
28  including controlling weight, to any medical opinion(s) or prior administrative

14

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017; see also 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  Greater weight is also given to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).  "In addition to considering the medical opinions of doctors, an ALJ must consider the opinions of medical providers who are not within the definition of 'acceptable medical sources.'"[11] Revels, 874 F.3d at 655 (9th Cir. 2017); see 20 C.F.R. § 404.1527(b), (f); SSR 06-03p, at *3 ("Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."); Garrison v. Colvin, 759 F.3d 995, 1013–14 (9th Cir. 2014) (other sources "can provide evidence about the severity of a claimant's impairment(s) and how it affects the claimant's ability to work") (citation and alterations omitted).

a. Dr. Bailey.

Dr. Bailey worked with The Neurology Group ("TNG").  AR 40.  Plaintiff began treating with Sadiq Altamimi, M.D., at TNG in February 2016.  AR 643.  At that time, Plaintiff reported that despite being diagnosed with MS for about 20 years, she was "off med for long" and "was stable" until "a few years ago" when

---

medical finding(s), including those from [a claimant's] medical sources.  20 C.F.R. § 404.1520c(a).

[11] For claims filed after March 27, 2017, the Agency has ceased to distinguish between an "acceptable medical source" and an "other medical source." 20 C.F.R. § 404.1520c.

1    she developed serious symptoms and started to use a walker.  AR 643.  Dr.

2    Altamimi, however, observed "normal posture and gait."  AR 646.  This was

3    consistent with observations by other medical sources made both earlier and later.

4    See AR 486, 489, 1978 (normal gait in July and August 2015), 1163 (normal gait in

5    November 2016), 884, 1143, 1150, 1157 (normal gait in January, April, and

6    November 2017), 1305 (walker "would not be considered necessary for

7    ambulation" in September 2018).

8         Plaintiff reported that she saw Dr. Bailey at TNG starting in 2017 for

9    natalizumab/Tysabri infusions after discontinuing Copaxone.  AR 1230.  Instead of

10   starting Tysabri, however, Plaintiff started an oral medication, Aubagio, in the

11   summer of 2017, after which she reported a "marked decline in both her gait and

12   cognition."  AR 1230; see also AR 1284 (In December 2017 "on PO [oral] Aubagio

13   MS medications.  Did not change to injection med.").  Plaintiff does not cite to any

14   treating records authored by Dr. Bailey in the AR.

15        In his December 2017 RFC Questionnaire, Dr. Bailey opined that Plaintiff

16   had no applicable diagnosis but MS, so his questionnaire does not support the

17   existence of additional functional limitations attributable to fibromyalgia.  AR 36.

18   Although his specialty is neurology, Dr. Bailey described Plaintiff as having serious

19   limitations on her mental functioning, such as difficulty remembering, difficulty

20   solving problems, problems with judgment, and sensory disturbances, and he

21   opined that this description of her limitations applied since 1980.  AR 36–37.

22   Plaintiff, however, worked for many years as a court reporter between 1980 and

23   2013.  AR 334.

24        Dr. Bailey opined that Plaintiff suffered from depression, anxiety,

25   somatoform disorder, and personality disorder.  AR 37.  Due to these mental

26   impairments, he opined that she was "incapable" of tolerating even "low" levels of

27   stress and could not concentrate sufficiently to persist at even "simple work tasks."

28   AR 38.  He, however, identified Aubagio to treat MS as her only medication,

apparently unfamiliar with whether she was taking any medications to manage her depression, anxiety, or pain.  AR 37.  He also failed to explain how his opinions fit with Plaintiff's reported activities demonstrating not-so-impaired mental functioning, such as using a phone and computer, renting rooms, pursuing legal claims, writing letters and survey responses, riding public transportation, and going to medical appointments alone.  See, e.g., AR 93–94, 353, 358–61, 707, 860–70, 1957.

Dr. Bailey's questionnaire leaves blank some sections that request support for or an explanation of his opinions.  AR 37.  His questionnaire is also internally inconsistent.  Compare AR 36 (failing to check the box indicating that Plaintiff exhibits depression), with AR 37 (checking the box indicating that Plaintiff is affected by depression).  As another example of internal inconsistency, he opined that Plaintiff had dizziness, instability walking, poor coordination, balance problems, and weakness (AR 36), yet he also opined that Plaintiff did not need to be restricted against exposure to heights or hazardous machinery (AR 39).  He opined that she could "rarely" climb stairs (AR 39), but Plaintiff lived in a two-story house and reported in 2018 that she could go up and down the stairs if she went slowly and used the handrail (AR 1304).  Internal inconsistencies in a treating physician's reports may be a specific and legitimate basis to reject those reports.  See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999); accord Buckner-Larkin v. Astrue, 450 F. App'x 626, 628 (9th Cir. 2011).

Perhaps most problematically, Dr. Bailey opined that Plaintiff could only walk ¼ mile without rest or severe pain.[12]  AR 38.  When the form asked if she needed as assistive device to ambulate, he checked both "yes" and "no."  AR 39.

---

[12] In November 2015, Plaintiff reported that she could walk only ½ block and needed a walker to do so.  AR 371–72.  In March 2018, however, she reported that she could walk "a few miles at a time 1–2 years ago," referring to 2016 or 2017.  AR 1230.

17

Dr. Bailey opined that Plaintiff's MS caused "generalized paresthesis" rather than pain, checking boxes to indicated she suffered from conditions that would cause a visibly unstable gait, such as balance problems, unstable walking, poor coordination, weakness, and paralysis.  AR 36.  Yet just **six days earlier** on November 29, 2017, Nadir A. Eltahir, M.D., a specialist who treated Plaintiff's sleep apnea, observed, "Gait: Within Normal Limit."  AR 1143.

Other medical sources who observed Plaintiff in 2018 (i.e., shortly after Dr. Bailey's December 2017 questionnaire) also observed that Plaintiff's walking ability was not nearly as limited as Dr. Bailey described.  In January 2018, upon complaining of left ankle pain, Arrowhead Orthopaedics observed that although Plaintiff used a walker, she had no calf atrophy and 5/5 motor strength with a full range of motion in her lower extremities.  AR 1974–75.  In May 2018, Plaintiff had a "grossly normal" motor exam of all extremities.  AR 1879.  When Plaintiff visited the ER in August 2018 complaining of a shingles rash, ER staff noted that she "ambulates with a stable gait."  AR 1892.  All this evidence is consistent with the observations of CE Dr. Maze in September 2018 that Plaintiff's use of a walker was "difficult to explain" and that it might be beneficial to observe Plaintiff's gait when she was "unaware that she is under observation."  AR 1306.

For all these reasons, Dr. Bailey's RFC Questionnaire appears to be based on an acceptance of Plaintiff's exaggerated claims of physical and mental functional limitations.  The ALJ gave clear and convincing reasons for discounting Plaintiff's testimony (AR 20–21), which she does not challenge on appeal.  "A physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted."  Morgan, 169 F.3d at 602 (citation omitted); accord Buck, 869 F.3d at 1049; see De Botton v. Colvin, 672 F. App'x 749, 751 (9th Cir. 2017) (ALJ properly rejected treating physician's opinion which "relied on [the claimant's] self-serving statements").

1    Nor does Dr. Bailey's opinion undermine the ALJ's RFC determination.  The

2    ALJ provided substantial evidence for his RFC determination.  After thoroughly

3    discussing the medical evidence (AR 21–25), the ALJ gave some weight to Dr.

4    Maze's opinion limiting Plaintiff to light work (AR 25).  Dr. Maze's opinion alone

5    constitutes substantial evidence in support of the ALJ's RFC assessment.  See

6    Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultative examiner's

7    opinion alone constitutes substantial evidence because it relies on the CE's

8    independent examination of the claimant).  However, because of Dr. Maze's

9    skepticism with Plaintiff's need for a walker, the ALJ rejected Dr. Maze's two-hour

10   stand/walk limitation.  AR 25.  While the ALJ found the state agency consultant's

11   conclusion that Plaintiff was limited to sedentary exertional work "too restrictive"

12   (AR 25, 142), the jobs identified by the ALJ as consistent with Plaintiff's RFC are

13   all sedentary, unskilled positions (AR 27).

14          b.     NP Lakin.

15   NP Lakin submitted a one-page letter dated February 14, 2019, listing

16   multiple symptoms, including balance impairment, urinary and bowel incontinence,

17   cognitive impairment, slurred speech, difficulty swallowing, severe fatigue, chronic

18   headaches, weakness, sensory deficits, vision impairment, and depression.  AR 41.

19   However, neither NP Lakin nor Plaintiff identify *any* medical evidence that

20   supports these extreme symptoms.  An unsupported medical opinion is entitled to

21   little weight.  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th

22   Cir. 2004) (ALJ may properly discount a treating physician's opinion that is

23   conclusory, brief, and unsupported by the overall medical record).  NP Lakin also

24   opined that Plaintiff is "unable to work due to her symptoms and functional

25   impairment."  AR 41.  But whether Plaintiff is unable to work is an issue left solely

26   to the Commissioner.  Martinez v. Astrue, 261 F. App'x 33, 35 (9th Cir. 2007)

27   ([T]the opinion that Martinez is unable to work is not a medical opinion, but is an

28   opinion about an issue reserved to the Commissioner.  It is therefore not accorded

1   the weight of a medical opinion."); see 20 C.F.R. § 404.1527(d)(1) ("A statement

2   by a medical source that you are 'disabled' or 'unable to work' does not mean that

3   we will determine that you are disabled.").  NP Lakin's conclusory opinion does

4   not undermine the substantial evidence cited by the ALJ in support of his RFC

5   determination.

6              c.     Dr. Morrison-Banks.

7        In December 2018, Dr. Morrison-Banks completed a physical RFC

8   questionnaire.  AR 42–45.  Dr. Morrison-Banks opined that Plaintiff's only mental

9   impairment was depression, but she lacked sufficient concentration to sustain even

10  simple work, was incapable of even low stress work, and would miss work more

11  than four days per month.  AR 43, 45.  Concerning Plaintiff's physical limitations,

12  she opined that Plaintiff could sit and stand or walk for only less than 2 hours per

13  day, suggesting that Plaintiff needed to spend the remainder of every day lying

14  down.  She opined that Plaintiff could "never" climb stairs (AR 44), again despite

15  Plaintiff reporting that she could (AR 1304).  As supporting attachments, the

16  questionnaire refers to a "progress note from 8/13/18" and "Dr. Brandon's report

17  for neuropsychological disability." [13]  AR 42, 45.  These documents are in the

18  record at AR 1925–31 and AR 1960–66 respectively. The ALJ considered Dr.

19  Morrison-Banks's treating records (AR 23–24) and Dr. Brandon's report (AR 24,

20  26).

21       Dr. Morrison-Banks's extreme opinions of Plaintiff's mental limitations

22  explicitly rely on Dr. Brandon's report which the ALJ considered and accorded

23  little weight.  AR 26.  That analysis was not challenged on appeal.  The

24  questionnaire, therefore, does not undermine the ALJ's determination of Plaintiff's

25  mental RFC.

26

27           [13] Antonius D. Brandon, Ph.D., was a clinical and child neuro-psychologist

28  with the Riverside Psychiatric Medical Group.  AR 1960.

Dr. Morrison-Banks's opinions of Plaintiff's physical limitations are entitled to little weight for some of the same reasons discussed above in connection with Dr. Bailey.  Again, while Dr. Morrison-Banks opined that Plaintiff had extreme limitations on walking and standing in December 2018, the record contains observations from at least four other medical sources in 2018 who found Plaintiff's motor strength and gait normal.  AR 1143, 1306, 1974–75, 1879, 1892.  Dr. Morrison-Banks's records also contain multiple findings of give-way weakness and failing to follow prescribed treatments.[14]  See, e.g., AR 1232 (in March 2018, "some give-way weakness" despite "normal [muscle] bulk and tone" and "[s]trength was 5/5 throughout except 4/5 right shoulder abduction"), 1235 (in May 2018, Plaintiff was taking less than her prescribed dosage of pain medication because she was "concerned about taking so many medications"), 1918–25 (in July 2018, Plaintiff decided not to try Ocrevus and instead start natalizumab/Tysabri), 1926–31 (in August 2018, Plaintiff declined to start natalizumab/Tysabri due to concern about potential side effects; "strength testing was inconsistent in all extremities with prominent give-way weakness"), 1941–45 (in October 2018, "strength testing was inconsistent in all extremities with prominent give-way weakness").  Thus, Dr. Morrison-Banks's extreme limitations were inconsistent with her own treatment notes.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (incongruity between treating physician's opinion and his treating records is a specific and legitimate reason for rejecting physician's opinion); Batson, 359 F.3d at 1195 (ALJ may properly discount a treating physician's opinion that is conclusory, brief, and unsupported by the overall medical record);

---

[14] "Give-way weakness" indicates that Plaintiff did not give full effort during testing.  Cherpes v. Berryhill, 727 F. App'x 319, 320 (9th Cir. 2018) ("the ALJ found Cherpes not credible, because two of Cherpes's examining physicians indicated Cherpes demonstrated 'give-way' weakness during testing, indicating Cherpes was not giving full effort").

1    Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ "need not accept the

2    opinion of any physician, including a treating physician, if that opinion is brief,

3    conclusory and inadequately supported by clinical findings").

4           As discussed above, the ALJ provided substantial evidence for his RFC

5    determination.  AR 21–26.  Dr. Morrison-Bank's extreme and largely unsupported

6    limitations do not undermine the ALJ's determination.

                                       **IV.**

                                  **CONCLUSION**

9           For the reasons stated above, IT IS ORDERED that judgment shall be

10   entered AFFIRMING the decision of the Commissioner.

12   DATED:  March 3, 2021            _____
                                      KAREN E. SCOTT
13                                    United States Magistrate Judge

22